

## Fourth Court of Appeals
### San Antonio, Texas

## MEMORANDUM OPINION

No. 04-19-00238-CV

**PREMIEANT INCORPORATED** d/b/a Premieant,
Appellant

v.

Constance **SNOWDEN**, as next Friend and Legal Guardian of
Annette Snowden, an Incapacitated Person,
Appellee

From the 224th Judicial District Court, Bexar County, Texas
Trial Court No. 2018CI14231
Honorable Mary Lou Alvarez, Judge Presiding

Opinion by:    Liza A. Rodriguez, Justice

Sitting:    Rebeca C. Martinez, Justice
Luz Elena D. Chapa, Justice
Liza A. Rodriguez, Justice

Delivered and Filed: March 11, 2020

AFFIRMED

Premieant, Inc. d/b/a Premieant ("Premieant") appeals the trial court's interlocutory order

overruling its objections to two expert reports and denying its motion to dismiss this health care

liability lawsuit. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b); *see id.* § 51.014(a)(9).  We

affirm the trial court's order denying Premieant's motion to dismiss and remand the case to the

trial court for further proceedings.

**BACKGROUND**

Constance Snowden brought this health care liability lawsuit against Premieant and Arnold's Angels Day Habilitation Center ("Arnold's Angels") as the next friend and legal guardian of her sister Annette Snowden, an incapacitated person. Annette Snowden is a 59-year-old woman with severe cognitive disabilities who is mute and blind and confined to a wheelchair. She resides at Carriage House, which is a long-term care group home for mentally disabled adults. Carriage House is owned and operated by Premieant as a "home and community-based services program" which is a joint federal and state-funded Medicaid program under the Social Security Act.

Beginning in August 2015, Carriage House staff began taking Snowden to the Arnold's Angels' facility during business hours so she could participate in its day-habilitation program ("day-hab") for disabled adults. As of May 2016, based on an individual assessment, Snowden's care plan at Carriage House required constant "eyes-on" supervision, specifically stating that she "must be within eye sight of staff at all times as she is unable to move from harm's way should other individuals come toward her to do her harm." Premieant does not dispute the constant "eyes-on" requirement of Snowden's care plan.

On November 4, 2016, Carriage House staff transported Snowden to Arnold's Angels' off-site facility for day-hab. Snowden contends the Carriage House staff failed to inform Arnold's Angels staff of the requirement in her care plan that she be kept under constant "eyes-on" supervision before leaving her at the Arnold's Angels facility. At approximately 10:00 a.m., a staff member of Arnold's Angels left Snowden unsupervised in the same room with a mentally-challenged male who sexually assaulted Snowden. Snowden was taken to the hospital and treated as a victim of sexual assault. Adult Protective Services and the Bexar County Sheriff's Office conducted a sexual assault investigation.

In the lawsuit filed on her behalf, Snowden asserts that Carriage House/Premieant was negligent in: (1) failing to ensure its resident's safety; (2) failing to promote a safe environment for its resident, including but not limited to an environment free of sexual assault; and (3) failing to protect its resident from facility acquired injuries, including but not limited to sexual assault.[1] Snowden timely served Premieant with the expert reports and curricula vitae of David Seignious, M.D., a physician specializing in geriatrics and internal medicine, and John C. Hyde II, Ph.D., a health care administrator and consultant. Premieant objected to both expert reports and to Dr. Hyde's qualifications on standard of care and moved for dismissal of the case. In response, Snowden served Premieant with amended expert reports by Dr. Seignious and Dr. Hyde. Premieant filed similar objections to the sufficiency of the amended reports and to Dr. Hyde's qualifications, along with a motion to dismiss. After a hearing, the trial court overruled Premieant's objections and denied its motion to dismiss. Premieant appealed.

## ANALYSIS

Chapter 74 of the Texas Civil Practice and Remedies Code requires a plaintiff bringing a healthcare liability suit against a health care provider[2] to file and serve an expert report providing a fair summary of the expert's opinion with respect to each element of the claim. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (also requiring the expert's curriculum vitae); *id.* § 74.351(r)(6). To be adequate, a report must fairly summarize the expert's opinions regarding: the applicable standard of care; (2) the manner in which the care rendered by the healthcare provider failed to

---

[1] Snowden sued Arnold's Angels for the same negligent omissions, as well as failing to properly train its employees regarding appropriate supervision and failing to enforce policies and procedures regarding resident protection. The record before us does not reflect that Arnold's Angels has filed an answer in the case.

[2] Premieant concedes it is a health care institution, as is Carriage House, and therefore a health care provider within the meaning of the statute. *See* TEX. CIV. PRAC. & REM. CODE § 74.001(a)(11)(I) (definition of "health care institution" includes "a home and community-based services program for persons with mental retardation adopted in accordance with Section 1915(c) of the federal Social Security Act;" *see also id.* § 74.001(a)(12)(A)(vii) (definition of "health care provider" includes a health care institution).

meet that standard; and (3) the causal relationship between that failure and the alleged harm. *Id.* § 74.351(r)(6). Reports of separate experts may be submitted on the different issues. *Id.* § 74.351(i). An expert report required by section 74.351 must constitute an objective good faith effort to comply with the statutory requirements and may not be merely conclusory. *Id.* § 74.351(l); *Am. Transitional Care Ctrs. of Texas, Inc. v. Palacios*, 46 S.W.3d 873, 878-79 (Tex. 2001). "No particular words or formality are required, but bare conclusions will not suffice" and "[t]he report must address all the elements, and omissions may not be supplied by inference." *Scoresby v. Santillan*, 346 S.W.3d 546, 556 (Tex. 2011). Courts review the sufficiency of the expert report by looking within the four corners of the report. *Palacios*, 46 S.W.3d at 878. To evidence a good faith effort, the report must contain sufficient information to serve two purposes: (1) to inform the defendant of the specific conduct called into question; and (2) to provide the trial court with a basis to conclude the claims have merit, i.e., are not frivolous. *Id.* at 879; *Scoresby*, 346 S.W.3d at 552 (fundamental goal of the statute is to weed out frivolous lawsuits early and thereby reduce the costs of health care).

The preliminary expert report need not meet the evidentiary standards for admission at trial or for summary judgment evidence in order to constitute a good faith effort and need not marshal all the plaintiff's evidence. *Palacios*, 46 S.W.3d at 878-79. "While the plaintiff is not required to prove her claim with the expert report, the report must show that a qualified expert is of the opinion she can." *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017). A report meets the minimum requirements under the statute if it contains the opinion of an individual with expertise that the claim has merit and if the defendant's conduct is implicated. *Scoresby*, 346 S.W.3d at 556. The statute provides the plaintiff an opportunity to cure an expert's lack of relevant qualifications and an opinion's inadequacies as long as the opinion is not "utterly devoid of substance." *Id.* at 549 (the lenient standard assures a claimant of a fair opportunity to

demonstrate her claim is not frivolous); TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(c) (trial court may grant one 30-day extension to cure a deficiency). An appellate court reviews the trial court's ruling on the adequacy of an expert report and denial of a motion to dismiss for an abuse of discretion. *Palacios*, 46 S.W.3d at 875; *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (trial court abuses its discretion when it acts arbitrarily or unreasonably and without reference to any guiding rules and principles).

On appeal, Premieant asserts the trial court abused its discretion in overruling its objections to Dr. Hyde's amended report because he is unqualified to opine on the standard of care applicable to a community-based services program such as Carriage House and on the purported breach of that standard in this case. As to Dr. Seignious's amended report, Premieant argues its objection to his opinion on causation should have been sustained because it is predicated on Dr. Hyde's "unqualified and vague opinions as to standard of care and breach" and is speculative and conclusory.

### Dr. Hyde's Qualifications to Opine on Standard of Care and Breach

Premieant argues Dr. Hyde is not qualified to opine on the standard of care applicable to Carriage House, and whether it was breached, because his expert report and curriculum vitae do not show that he has direct experience administering or supervising employees in a home and community-based services ("HCBS") program.[3] Premieant explains that HCBS waiver programs[3] provide opportunities for Medicaid beneficiaries to receive long-term care services and support in

---

[3] "Home and Community Based Services (HCBS) first became available in 1983 when Congress added section 1915(c) to the Social Security Act, giving States the option to receive a waiver of Medicaid rules governing institutional care." *See* https://www.medicaid.gov/medicaid/home-community-based-services/home-community-based-services-authorities/index.html. An HCBS program must: (1) demonstrate that the cost of providing waiver services will not exceed the cost of providing such services in an institution; (2) ensure the protection of the person's health and welfare; (3) provide adequate and reasonable provider standards to meet the needs of the target population; and (4) ensure that services follow an individualized care plan. *See* https://www.medicaid.gov/medicaid/home-community-based-services/home-community-based-services-authorities/home-community-based-services-1915c/index.html.

their own home or community instead of an institutional setting and serve people with intellectual or developmental disabilities, physical disabilities, and/or mental illnesses. Premieant asserts that HCBS programs are unique in that the providers, like Carriage House and Arnold's Angels, receive their funding from the government on a "fee-for-service" basis; the providers are paid for each service they supply to the patient. Carriage House provided Snowden with living accommodations in a small group home and assistance with the activities of daily living, while day-hab and other non-medical and medical services were supplied by other HCBS providers. Snowden responds that regardless of how it received funding or payment for the residential service it provided, Carriage House was still subject to the same standard of care as any other long-term care group home or living facility; at a minimum, that standard of care included a duty to protect Snowden from harm or injury, i.e., sexual assault.

Section 74.351(r)(5) defines who qualifies as an "expert" for purposes of providing an expert report in a health care liability suit. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(5). To qualify to give an opinion regarding whether a non-physician health care provider departed from the accepted standard of care, the person must meet the requirements of section 74.402. *Id.* § 74.351(r)(5)(B). Sections 74.402(b)(2) and (b)(3) provide that a person may qualify as an expert on the issue of whether a health care provider[4] departed from the accepted standards of care only if the person:

---

[4] By its terms, subsection (1) of section 74.402(b) only applies if the defendant health care provider is an individual. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(b)(1) (requiring that the purported expert is "practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, *if the defendant health care provider is an individual*, at the time the testimony is given or was practicing that type of health care at the time the claim arose) (emphasis added); *see also Gracy Woods I Nursing Home v. Mahan*, 520 S.W.3d 171, 183 n.56 (Tex. App.—Austin 2017, no pet.) (section 74.402(b)(1) does not apply if the "defendant health care provider" is not an individual); *Northeast Med. Ctr., L.P. v. Crooks*, No. 06-05-00149-CV, 2006 WL 1358361, at *4 (Tex. App.—Texarkana May 19, 2006, no pet.). (mem. op.) (section 74.402(b)(1) does not apply to entities); *Doctors Hosp. v. Hernandez*, No. 01-10-00270-CV, 2010 WL 4121678, at *5 (Tex. App.—Houston [1st Dist.] Oct. 21, 2010, no pet.) (mem. op.) (same).

(2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

*Id.* § 74.402(b)(2), (3). The person's qualifications must appear in the report or curriculum vitae and cannot be inferred. *Savaseniorcare Administrative Services, L.L.C. v. Cantu*, No. 04-14-00329-CV, 2014 WL 5352093, at *2 (Tex. App.—San Antonio Oct. 22, 2014, no pet.) (mem. op.).

Dr. Hyde's report and curriculum vitae state he has a Ph.D. in Healthcare Administration/Research and Organizational Studies from the University of Alabama at Birmingham and currently teaches Health Care Administration classes at the masters level at George Washington University on an adjunct basis and works as an independent health care consultant to various hospitals, healthcare organizations, healthcare trade/professional associations, and other healthcare related entities. Before obtaining his Ph.D. in 1994, he earned a B.S. in both Biology and Health Care Administration from Western Kentucky University and a M.S.H.A. in Health Care Administration from Trinity University. His professional experience includes working at the Medical Center at Bowling Green, Kentucky as Assistant Administrator, Associate Administrator, and Vice President; serving as the Administrator/CEO of Taylor County Hospital in Campbellsville, Kentucky; and serving as the CHC Vice President/Corporate Officer for Commonwealth Health Corporation in Bowling Green. Dr. Hyde also taught health care administration at the masters level at the University of Mississippi Medical Center for 28 years. In his additional capacity as an independent health care consultant since 1992, he has provided "advice to healthcare delivery organizations . . . regarding issues of administration . . . employee management . . . clinical and management outcome, as well as other healthcare needs." Dr. Hyde summarizes his professional experience as involving many areas, including but not limited to

"employee management, policy-making, training programs, staffing, quality control, practice guidelines, and ethical issues."

After describing his education, employment history, and professional experience, Dr. Hyde's report states that, based on his experience, he is familiar with the accepted standards of care applicable in Snowden's case because he has supervised "employees, including nurses and healthcare personnel, as well as care-giving personnel, like the ones employed by Premieant at Carriage House" and has "worked with other healthcare administrators, clinicians, and healthcare personnel to develop policies, guidelines, and standards that are applied to healthcare personnel in the caregiving situations [which] includes facilities like Carriage House that were created through government programs, including home and community-based services waiver programs." In a footnote, Dr. Hyde explains his knowledge of such programs, stating that, "Home and Community-Based Services (HCS) is a Medicaid waiver program that supplies services and supports to Texans with an intellectual disability or a related condition so that they can live in the community. HCS provides a number of services, including residential services like a long-term care group home (like Carriage House), nursing/therapy services, and day-habilitation opportunities (like Arnold's Angels)." He also notes that "[t]he Texas Department of Aging and Disability Services (DADS) contracts with public and private entities (like Premieant) to provide HCS services, and DADS is responsible to monitor these providers to ensure quality."

Dr. Hyde's report goes on to state,

Regardless of how Carriage House receives funding through the government, the reason that Ms. Snowden was under the care of the Premieant staff at Carriage House was because she had severe mental and functional disabilities. Premieant staff provided long-term care (including basic assistance with activities of daily living, eating, grooming, etc.) to Ms. Snowden while she was living at Carriage House. I am familiar with the standard of care required to provide services to a resident like Ms. Snowden at a facility like Carriage House. Based on my knowledge, training and experience *in this setting*, I am familiar with the healthcare policies, guidelines, and standards of care applicable to healthcare personnel

- 8 -

> providing care at facilities like Carriage House . . . to individuals like Ms. Snowden. Not only am I knowledgeable about what the standard of care is, but also how the standard of care may be breached.

(emphasis added).

The premise of all of Premieant's challenges to Dr. Hyde's qualifications is that he lacks the knowledge, training, and practice experience necessary to offer an opinion on the "unique" standard of care applicable to Carriage House, i.e., a long-term care group home for mentally disabled adults *that is operated as an HCBS provider*.

<u>Training and Experience</u>

Premieant first argues that Dr. Hyde's report and curriculum vitae do not establish that he has training or experience with the exact "same type of facility" that is at issue and therefore he is not qualified to opine on the applicable standard of care under section 74.402(b)(3). Premieant points out that his curriculum vitae does not list employment with a healthcare provider operating under an HCBS program, particularly an HCBS long-term care facility; rather, it reflects his employment at medical centers and hospitals. Premieant asserts Dr. Hyde's experience is "untethered from the very type of facility at issue — a community-based waiver program — or the specific issue relevant to the case." For that reason, it contends the trial court erred by inferring the necessary experience with an HCBS provider.

In determining whether a person is qualified "on the basis of training and experience" under subsection (b)(3), courts consider whether at the time the claim arose or at the time the testimony is given, the person (i) is certified by a licensing agency of one or more states or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim, and (ii) is actively practicing health care in rendering health care services relevant to the claim. TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(c). The statutory definition of "practicing health care" includes training health care providers in the same field as the defendant

health care provider at an accredited educational institution or serving as a consulting health care provider and being licensed, certified, or registered in the same field as the defendant health care provider. *Id.* § 74.402(a). Both facets of the inquiry required by subsection (c) focus on the area of health care "relevant to the claim." *See id.* § 74.402(c).

Here, the underlying nature of the claim is that while Snowden was still in the custody and control of Carriage House staff they failed to inform Arnold's Angels staff of the "constant eyes-on" requirement of Snowden's individual care plan that was deemed necessary to protect her from danger and injury. Snowden's petition alleges Carriage House failed to: "ensure its resident's safety;" "promote a safe environment . . . free of sexual assault;" and "protect its resident from facility acquired injuries including . . . sexual assault." Thus, at its heart Snowden's claim is a safety claim directly related to health care. *See Omaha Healthcare Ctr., LLC v. Johnson*, 344 S.W.3d 392, 394 (Tex. 2011) (explaining that a safety claim is a "healthcare liability claim" subject to the expert report requirement "if it is for a departure from accepted standards of safety directly related to 'any act . . . that should have been performed or furnished by [the healthcare provider] to, or on behalf of [the plaintiff] during [his/her] medical care, treatment, or confinement.'"). In *Omaha*, the court characterized the services a nursing home provides to its residents as including meeting the residents' "fundamental needs," which encompasses protecting the health and safety of the residents. *Id.* at 394-95 (defining "safety" as "being 'untouched by danger; not exposed to danger; secure from danger, harm or loss'"). Similarly, as stated in footnote three of this opinion, federal law requires an HCBS program to "ensure the protection of the person's health and welfare." The regulations governing HCBS providers in Texas specifically describe the provider's duty to keep the participant safe, requiring each provider to "ensure that each individual's humanity and dignity is respected" and to "protect and promote the . . . right[] of the individual . . . to live free from abuse, neglect, or exploitation in a healthful, comfortable, and safe

environment." *See* 40 TEX. ADMIN. CODE §§ 9.172, 9.173(b)(26); *see id.* § 9.153(1) (defining "abuse" to include physical abuse, sexual abuse, and emotional abuse), (68) (defining "neglect" as a negligent act or omission that caused, or placed an individual at risk of, physical or emotional injury).

Dr. Hyde's report and curriculum vitae show he is actively "practicing healthcare" by teaching health care administration at an accredited educational institution and serving as a consultant to different types of health care providers, and has substantial training and experience practicing healthcare administration in an area of health care "relevant to the claim." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(b)(3), (c). He states that he has "overseen employees, including nurses and healthcare personnel, as well as care-giving personnel, like the ones employed by Premieant at Carriage House" and "develop[ed] policies, guidelines, and standards that are applied to healthcare personnel in the caregiving situations," including at "facilities like Carriage House that were created through government programs, including home and community-based services waiver programs." In discussing a person like Snowden's right to fundamental safety in such facilities, which she claims was violated, Dr. Hyde explains that,

> [l]ike all medical and long-term care facilities, including HCS waiver program facilities like Carriage House group home, are required [sic] to comply with certain standards, codes, and guidelines that aim to, among other things, ensure patient safety, promote a safe environment to the patient, and to protect a patient from facility acquired injuries. Indeed, the standard of care mandates that when a patient is in the care of facilities like these, the patient may never be sexually assaulted and/or suffer a facility acquired injury.

Dr. Hyde cites the Patient's Bill of Rights and the Joint Commission as sources of the fundamental right of a patient "to be free from neglect, exploitation, and verbal, mental, physical, and sexual abuse." Premieant challenges his experience with that standard as inapplicable to an HCBS program, but it is the same standard quoted above from the Texas regulations governing HCBS programs in the state.

Premieant cites no authority stating that a section 74.351 expert must have specific experience working directly with an HCBS program to qualify to opine on the applicable standard of care, particularly when the standard at issue is the fundamental right of a resident or participant to be safe from danger and injury, i.e., in this case sexual abuse. Looking at the four corners of Dr. Hyde's report, it demonstrates that he is qualified on the basis of training and experience to offer an expert opinion regarding the standard of care related to protection from sexual abuse.

Knowledge of Applicable Standard of Care

Premieant also argues Dr. Hyde's report and curriculum vitae do not establish that he is knowledgeable of the unique standards of care applicable to Carriage House as an HCBS provider. *See id.* § 74.402(b)(2). Premieant challenges Dr. Hyde's report as misapplying the standards of care applicable to a generic long-term care facility, such as a nursing home, to Carriage House. Premieant asserts that HCBS programs are "fundamentally unique and disparate" from nursing homes and other long-term care facilities in that they are government programs funded on a fee-for-service basis. As such, each provider supplies only those services subject to reimbursement under the state regulations. The service provided by Carriage House, for which it is reimbursed under the HCBS program, is a long-term care group residence for eligible disabled adults like Snowden. Premieant stresses that Carriage House does not provide any medical, nursing, or therapy services; it provides residential assistance and support for its residents' basic needs of daily living. According to Premieant, the only role of Carriage House was to "provide[] a safe residence to Annette Snowden [while] certain habilitation and/or therapy happened off-site via third-party providers" like Arnold's Angels. Premieant stresses it was not responsible for the care its resident received at an off-site provider like Arnold's Angels. Finally, Premieant states that Carriage House residents' individual care plans are "written and overseen" by an HCBS service coordinator with the State, further making Carriage House unique.

In essence, Premieant contends that because Carriage House is an HCBS provider, the standards of care for other types of long-term care residential facilities do not apply to it. Not only does Premieant fail to provide us with any legal authority to support application of a different standard of care to a long-term care residence operating as an HCBS provider, it also fails to explain what alternative standard of care it contends does apply to Carriage House. The characteristics cited by Premieant as setting Carriage House apart from the standards of care applicable to nursing homes and other long-term care residential facilities boil down to the funding structure for the scope of services provided. Regardless of the source and structure of its funding, Carriage House provided a long-term care residence for Snowden and the requirements in her individual care plan remained. Further, for purposes of the underlying claim, it is not relevant whether it was Premieant or the State coordinator who created or modified Snowden's individual care plan. Premieant agrees that the "constant eyes-on" requirement was present in her care plan as of May 2016, several months before the November 2016 sexual assault. Snowden's main claim is based on Carriage House staff's failure to communicate that critical safety requirement of her care plan before Snowden was transferred into the care and custody of Arnold's Angels; the source of the "constant eyes-on" requirement is not relevant to the current issue.

The statute expressly ties the purported expert's knowledge of the applicable standard of care to the "injury or condition involved in the claim." *Id.* § 74.402(b)(2). Here, the injury and condition involved in Snowden's negligence claim is a sexual assault and the resulting physical and emotional injuries. Dr. Hyde's report explains how he acquired knowledge of the standards of care requiring protection of a patient or resident from danger or injury, including sexual abuse, in a long-term care facility. *See Savaseniorcare*, 2014 WL 5352093, at *2 (report must establish the purported expert has expertise regarding "the specific issue" before the court to qualify to give an opinion on "that particular subject"). The qualification analysis "focuses on 'the very matter'

on which the expert is to give an opinion. *Id.* (quoting *Broders v. Heise*, 924 S.W.2d 148, 153 (Tex. 1996)); *see Martinez-Partido v. Methodist Specialty & Transplant Hosp.*, 327 S.W.3d 274, 278 (Tex. App.—San Antonio 2010, no pet.); *see also Ibrahim v. Gilbride*, No. 14-09-00938-CV, 2010 WL 5064430, at *6 (Tex. App.—Houston [14th Dist.] Dec. 9, 2010, no pet.) (mem. op.) (expert must describe how he acquired sufficient knowledge, skill, experience, training, or education to opine on the applicable standard of care). Dr. Hyde specifically states that he has "worked in" and "overseen employees" including "care-giving personnel, like the ones employed by Premieant at Carriage House and by Arnold's Angels." He further states he has "develop[ed] policies, guidelines, and standards" that are applied to "healthcare personnel in the caregiving situations" which includes "facilities like Carriage House" that are operated as "home and community-based services waiver programs." In addition, Dr. Hyde states that, based on his "knowledge, training and experience *in this setting*," he is familiar with the standard of care "required to provide services to a resident like Ms. Snowden at a facility like Carriage House" (emphasis added). Specifically, he is familiar with the "healthcare policies, guidelines, and standards of care applicable to healthcare personnel providing care at facilities like Carriage House and Arnold's Angels to individuals like Ms. Snowden" and "how the standard of care can be breached."[5]

An expert's statement of his own knowledge of the standards of care applicable to the healthcare provider in a similar situation may be sufficient to establish his qualifications under section 74.402(b)(2) if the other statutory requirements are met. *See Baylor Med. Ctr. at*

---

[5] Premieant relies heavily on *Hickory Trail Hosp., L.P. v. Webb*, No. 05-16-00663-CV, 2017 WL 677828 (Tex. App.—Dallas Feb. 21, 2017, no pet.) (mem. op.), in arguing that Snowden failed to demonstrate Dr. Hyde's qualifications to opine on the standard of care applicable to Carriage House and whether it was breached. *Webb* is distinguishable, however, because there the report failed to state the purported expert ever worked with or supervised employees at, or formulated policies and procedures at, the specific type of health care provider involved in the claim. *See id.*, at *5 (report also failed to state that expert had knowledge of the standard of care applicable to the specific type of health care provider involved in the claim).

*Waxahachie v. Wallace*, 278 S.W.3d 552, 559 (Tex. App.—Dallas 2009, no pet.). A trial court does not abuse its discretion in accepting the expert's own statement of his familiarity with the applicable standard of care when the report explains how the expert acquired such knowledge. *See id.*; *see also Children's Med. Ctr. of Dallas v. Durham*, 402 S.W.3d 391, 399 (Tex. App.—Dallas 2013, no pet.). Dr. Hyde's report adequately established his knowledge of the accepted standard of care for healthcare providers like Premieant and Carriage House with respect to the injury claimed by Snowden.[6]

In sum, we conclude that Snowden met the statutory requirements and produced an expert report and curriculum vitae that established Dr. Hyde's qualifications to opine on the applicable standard of care and its breach under sections 74.402(b)(2) and (3) and we hold the trial court did not abuse its discretion in denying Premieant's objections to his qualifications. To the extent Premieant claims Dr. Hyde's report does not constitute an objective good faith effort to comply with the statutory requirements, we disagree and hold that, as discussed above, his report fairly summarizes his opinions on standard of care and breach and informs Premieant of the specific conduct or omission called into question in Snowden's claim. The preliminary expert report shows that a qualified expert holds the opinion that Snowden can prove her claim and her lawsuit is not frivolous. *See Palacios*, 46 S.W.3d at 879.

### Dr. Seignious's Amended Report

Next, Premieant argues the trial court abused its discretion by overruling its objections to Dr. Seignious's report on causation. Premieant asserts his opinion on proximate cause is deficient because it is predicated on Dr. Hyde's opinions on the applicable standard of care and Premieant's

---

[6] Premieant also asserts Dr. Hyde is unqualified to opine on "the role of a [HCBS provider] in directing the supervision of a resident while that resident is under the care, custody and supervision of another health care provider." We disagree that Dr. Hyde's report can be fairly characterized as containing such an opinion.

breach of the standard by failing to communicate the "eyes-on" safety requirement. Premieant also argues Dr. Seignious's opinion is speculative and conclusory as to how its breach proximately caused Snowden's injury. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6) (expert report must contain information concerning the expert's opinion on the causal relationship between the alleged breach and the injury, harm, or damages claimed).

Having determined that Dr. Hyde was qualified to opine on the applicable standard of care and its breach in this case, we hold that the trial court did not abuse its discretion in overruling Premieant's objection to Dr. Seignious's report on that basis.

We next consider whether Dr. Seignious's report constitutes an objective good faith effort to state how proximate cause will be proven. *See Zamarripa*, 526 S.W.3d at 460. To be a fair summary, the expert report must sufficiently "explain, based on facts set out in the report, how and why the breach caused the injury." *Id.*; *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015). "Proximate cause has two components: (1) foreseeability and (2) cause-in-fact." *Zamarripa*, 526 S.W.3d at 460 (quoting *Rodriguez-Escobar v. Goss*, 392 S.W.3d 109, 113 (Tex. 2013)). The foreseeability prong requires only that the defendant *should* have anticipated that its negligent act or omission would create danger or harm for others; it does not require the defendant to have actually anticipated the precise manner in which the injury would occur. *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992). "For a negligent act or omission to have been a cause-in-fact of the harm, the act or omission must have been a substantial factor in bringing about the harm" such that "but for the act or omission . . . the harm would not have occurred." *Zamarripa*, 526 S.W.3d at 460 (internal citation omitted).

Merely "incanting" the words proximate cause, foreseeability, or cause-in-fact will not suffice; an expert's simple *ipse dixit* or "because I said so" is insufficient to establish a matter. *Id.*; *Jelinek v. Casas*, 328 S.W.3d 526, 539-40 (Tex. 2010) (expert cannot simply opine that the breach

caused the injury, but must "explain, to a reasonable degree, how and why the breach caused the injury based on the facts presented"). Further, the report need not use the exact legal terms as long as it explains the basis of the expert's opinions by linking his conclusions to the facts. *Zamarripa*, 526 S.W.3d at 460. "While a fair summary is something less than all the evidence necessary to establish causation at trial, even a fair summary must contain sufficiently specific information to demonstrate causation beyond mere conjecture." *Savaseniorcare*, 2014 WL 5352093, at *4; *Hutchinson v. Montemayor*, 144 S.W.3d 614, 618 (Tex. App.—San Antonio 2004, no pet.).

Premieant asserts that Dr. Seignious's report fails to explain *how* Premieant's failure to inform Arnold's Angels of the requirement for "constant eyes-on" supervision, i.e., its breach of the standard of care, was a substantial factor in causing Snowden's sexual assault, "much less cause-in-fact." In the discussion in his report, Dr. Seignious first refers to Dr. Hyde's opinion that, "Premieant staff breached the standard of care in failing to in-service the Arnold's Angels staff on Carriage House's own May 2016 assessment that Ms. Snowden 'must be within eye sight of staff at all times as she is unable to move from harm's way should other individuals come toward her to do her harm.'" He then opines, "[h]ad Premieant staff done the required in-service at any point prior to the November 2016 sexual assault, Arnold's Angels staff would have been aware of the need to always have Ms. Snowden within eye sight of all staff. Had Ms. Snowden stayed in the line of Arnold's Angels' staff's eye sight, she would not have been left alone with another male resident . . . ." His report continues, "Arnold's Angels staff would have had the opportunity to intervene when they saw a male resident moving towards Ms. Snowden and certainly when he began assaulting her." Dr. Seignious therefore concludes, "Ms. Snowden would not have been sexually assaulted during the time frame when Arnold's Angel's [sic] staff exited the room, leaving [the male resident] and Ms. Snowden unsupervised." Dr. Seignious's report sufficiently explains "how and why" Premieant's breach of the standard of care regarding communicating Snowden's

need for constant supervision was a cause-in-fact of her injury — if informed of the need for constant supervision, Arnold's Angels' staff would have been aware of the "eyes-on" requirement of Snowden's care plan, would not have left her unattended with a male resident, and would have been able to intervene and prevent the sexual assault. *See Zamarripa*, 526 S.W.3d at 460 (expert report must sufficiently explain how and why the breach caused the injury based on the facts).

Premieant argues Dr. Seignious's explanation of the causal link improperly assumes Arnold's Angels' staff would have followed the constant supervision requirement if informed. An injury may have more than one proximate cause, and the defendant's negligence must only be a substantial factor in causing the injury; it need not be the immediate cause. *Windrum v. Kareh*, 581 S.W.3d 761, 777-78 (Tex. 2019). Further, "[a]n expert may also establish causation by explaining a chain of events that begins with a defendant healthcare provider's negligence and ends in injury to the plaintiff." *Christus Spohn Health System Corp. v. Hinojosa*, No. 04-16-00288-CV, 2016 WL 7383819, at *6 (Tex. App.—San Antonio Dec. 21, 2016, no pet.) (citing *McKellar v. Cervantes*, 367 S.W.3d 478, 485 (Tex. App.—Texarkana 2012, no pet.)). The expert report is not required to prove the defendant's liability, only to provide notice of what conduct forms the basis of the plaintiff's claims. *Regent Care Ctr. of Laredo, L.P. v. Abrego*, No. 04-07-00320-CV, 2007 WL 3087211, at *4 (Tex. App.—San Antonio Oct. 24, 2007, pet. denied); *Longino v. Crosswhite*, 183 S.W.3d 913, 916 (Tex. App.—Texarkana 2006, no pet.). Dr. Seignious's report makes clear that Premieant's failure to communicate the "eyes-on" requirement started the causal chain of events that ended in the sexual assault. The argument that Arnold's Angels' staff might have failed to follow the constant supervision requirement is an argument for trial and not part of the court's assessment of the sufficiency of a preliminary expert report on causation. *See Palacios*, 46 S.W.3d at 879.

Premieant also contends that Dr. Seignious fails to explain how a sexual assault at an off-site facility where Snowden was outside Premieant's custody and control was foreseeable to Premieant. However, Premieant's argument is based on its ability to foresee the likelihood of a *sexual* assault in particular, not the foreseeability of the likelihood of a physical injury to Snowden if left unsupervised. While Dr. Seignious's report does not use the term "foreseeable," it explains the facts that show Premieant's actual knowledge that Snowden was vulnerable to danger or injury if left unsupervised based on its own assessment months prior to the sexual assault, finding that she was "unable to move [away] from harm's way *should other individuals come toward her to do her harm*." (emphasis added). Thus, Dr. Seignious's report explains the facts showing that Premieant did indeed foresee a likelihood of harm to Snowden from other individuals if she was left unattended.

Finally, Premieant challenges as speculative Dr. Seignious's additional opinion that if Premieant had adequately screened Arnold's Angels and done its due diligence, it would have realized it was an unsafe facility and would not have left Snowden there and she would not have been sexually assaulted. We need not address this alternate theory of liability because the expert report need only establish that one theory of liability has merit. *See Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 629-30 (Tex. 2013) (plaintiff's expert report need only adequately address one theory of liability and then plaintiff may proceed with her whole case).

We conclude that Dr. Seignious's report constitutes a fair summary of his opinion on causation and harm[7] in that it factually explains the causal relationship between the alleged breach of the standard of care by Carriage House staff and Snowden's sexual assault.

---

[7] Dr. Seignious's report also explains how the sexual assault caused physical and emotional harm to Snowden. Premieant does not challenge the sufficiency of the report as to the injuries and harm suffered by Snowden.

**CONCLUSION**

Based on the foregoing analysis, we conclude the trial court did not abuse its discretion in overruling Premieant's objections to the expert reports produced by Snowden. Accordingly, we affirm the trial court's order denying Premieant's motion to dismiss the case and remand to the trial court for further proceedings.

Liza A. Rodriguez, Justice